2005 UT 86

**STATE of Utah, Plaintiff and Petitioner,**

v.

**Tomas G. ROJAS–MARTINEZ, Defendant and Respondent.**

**No. 20030668.**

Supreme Court of Utah.

Nov. 22, 2005.

———————

Mark L. Shurtleff, Att'y Gen., Christopher D. Ballard, Asst. Att'y Gen., Salt Lake City, for plaintiff.

Hakeem Ishola, Salt Lake City, for defendant.

NEHRING, Justice:

¶ 1 This case presents the question of whether the court of appeals correctly determined that Mr. Rojas–Martinez's defense counsel provided ineffective assistance by advising him, an undocumented foreign national, that he "might or might not" be deported if he pleaded guilty to a sexual battery charge, even though the offense was automatic cause for deportation under federal law. We reverse.

## FACTUAL AND PROCEDURAL HISTORY

¶ 2 Tomas G. Rojas–Martinez was accused of touching the breast of a sixteen-year-old juvenile, over her clothing and without her consent. On May 28, 2002, he was charged with one count of sexual battery, which is a class A misdemeanor under Utah Code Ann. § 76–9–702(3) (Supp.2000). Mr. Rojas–Martinez's guilty plea triggered, however, additional consequences to the penalties permitted for a class A misdemeanor. Under federal immigration law, specifically section 101 of the Immigration and Nationality Act, sexual abuse of a minor is classified as an aggravated felony and therefore a deportable offense. 8 U.S.C. § 1101(a)(43)(A) (Supp.2003); 8 U.S.C. § 1277(a)(2)(A)(iii).[1]

¶ 3 When Mr. Rojas–Martinez entered his guilty plea, the trial judge made appropriate inquiry to satisfy himself that Mr. Rojas–Martinez understood the English language and conducted the review of rights that Mr. Rojas–Martinez was surrendering as required by rule 11 of the Utah Rules of Criminal Procedure.[2] The trial court accepted Mr.

Rojas–Martinez's guilty plea and sentenced him to 365 days in jail. Soon thereafter, Mr. Rojas–Martinez was subjected to deportation proceedings.

¶ 4 Mr. Rojas–Martinez timely moved to withdraw his guilty plea. At the hearing on this motion, Mr. Rojas–Martinez's counsel testified that Mr. Rojas–Martinez expressed concern over the effect of the guilty plea on his immigration status. Counsel responded by telling Mr. Rojas–Martinez that "as this was a misdemeanor, sometimes the INS does not deport because of lack of resources or for whatever reason, they do not deport, but ... he could not count on that, that they do have the authority to deport him."

¶ 5 The trial court ruled that, prior to the plea hearing, Mr. Rojas–Martinez's counsel had "informed [him] that [a] guilty plea and conviction could lead to deportation, but it might or might not." Concluding that Mr. Rojas–Martinez counsel "did not affirmatively misrepresent the [deportation] consequences of ... Defendant's guilty plea," the trial court denied the motion.

¶ 6 Mr. Rojas–Martinez appealed to the Utah Court of Appeals, arguing that the trial court erred in denying his motion to withdraw his guilty plea. To support his claim, he argued that (1) he received ineffective assistance of counsel because his counsel misstated the law regarding deportation and the consequences of a guilty plea, (2) his consent was "involuntary" and invalid due to the incompetent advice, and (3) the trial court failed to comply with rule 11 of the Utah Rules of Criminal Procedure by failing to provide an interpreter during the plea proceedings. *See State v. Rojas–Martinez*, 2003 UT App 203, ¶ 11 nn. 5–6, 73 P.3d 967.

---

1. 8 U.S.C. § 1101(a)(43)(A) reads: "The term aggravated felony means (A) murder, rape, or sexual abuse of a minor." 8 U.S.C. § 1227(a)(2)(A)(iii) adds: "(a) classes of deportable aliens (2) criminal offenses (A) General crimes (iii) Aggravated felony: Any alien who is convicted of an aggravated felony at any time after admission is deportable."

2. In short, rule 11(e) instructs the court that it may not accept a guilty plea until it finds that (1) the defendant has counsel or has knowingly waived that right; (2) the plea was made volun-

tarily; (3) the defendant is aware of the presumption of innocence, the right against self-incrimination, the right to a speedy trial before an impartial jury, the right to confront and cross-examine witnesses, the right to compel attendance of defense witnesses, and that these rights are waived by entering a guilty plea; and (4) the nature and elements of the charged offense are understood, that the prosecution has the burden of establishing the offenses beyond a reasonable doubt, and that there is a factual basis for the plea. Utah R. Civ. P. 11.

¶ 7 The court of appeals reversed the trial court's finding that counsel's advice did not constitute ineffective assistance of counsel based on the United States Supreme Court's two-pronged test articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Rojas–Martinez*, 2003 UT App 203, ¶¶ 10–11, 73 P.3d 967. To support its conclusion, the court reasoned that although the crime is only a misdemeanor under Utah law, federal immigration law classifies a sexual offense with a minor as an aggravated felony, which eliminates any discretion the government would otherwise have to waive deportation. *Id.* ¶ 9. Because Mr. Rojas–Martinez was advised that he "might or might not be deported," the appellate court held that counsel provided inadequate assistance when he affirmatively misrepresented the legal consequences of his guilty plea. *Id.* ¶ 10. The court also found that Mr. Rojas–Martinez was prejudiced by counsel's misrepresentation because the misstatement created a reasonable probability that, but for the advice, the result of the proceeding would have been different. *Id.* ¶ 11. Faced with Mr. Rojas–Martinez's affidavit that he would have "gone to trial [to] prove [his] innocence," the court of appeals concluded that counsel's actions did in fact prejudice Mr. Rojas–Martinez. *Id.*

## STANDARD OF REVIEW

¶ 8 "On certiorari, 'we review the decision of the court of appeals and not that of the trial court.' Furthermore, 'we review the decision of the court of appeals for correctness.'" *Harris v. Albrecht*, 2004 UT 13, ¶ 8, 86 P.3d 728 (quoting *Collins v. Sandy City Bd. of Adjustment*, 2002 UT 77, ¶ 11, 52 P.3d 1267).

## ANALYSIS

¶ 9 Mr. Rojas–Martinez argues that he was denied his Sixth Amendment guarantee of counsel when his counsel misinformed him of the deportation consequences of a guilty plea to the charged offense. Amendment VI of the United States Constitution states: "In all criminal prosecutions, the accused shall ... have the assistance of counsel for his defense." U.S. Const. Amend. VI. The Su-

preme Court extended this constitutional right to include effective assistance of counsel in *McMann v. Richardson*, 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970), holding that the promise made by the amendment would be hollow if defendants were "left to the mercies of incompetent counsel." The generalized principle that the right to counsel included the guarantee of effective counsel spawned the two-pronged test of effectiveness announced in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The *Strickland* test weighs whether (1) "counsel's performance was deficient below an objective standard of reasonable professional judgment, and (2) counsel's performance prejudiced the defendant." *Id.* The Court also noted that ineffective assistance of counsel claims may be defeated upon a finding by the court that either prong was not satisfied. *Id.* at 697, 104 S.Ct. 2052.

¶ 10 This court has previously adopted the *Strickland* test when deciding a challenge to a guilty plea based on ineffective assistance of counsel in *State v. Martinez*, 2001 UT 12, ¶ 16, 26 P.3d 203 (following *Hill v. Lockhart*, 474 U.S. 52, 58, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985), which stated that "the two-part *Strickland v. Washington* test applies to challenges to guilty pleas based on ineffective assistance of counsel"). This appeal is our first experience in addressing an ineffective assistance of counsel challenge based on an alleged failure to provide accurate information about the collateral consequences of a guilty plea. This issue, however, has been addressed by our court of appeals in *State v. McFadden*, 884 P.2d 1303 (1994), and we look to that decision as a logical embarkation point for our analysis of Mr. Rojas–Martinez's appeal.

## I. THE *McFADDEN* APPROACH TO COLLATERAL CONSEQUENCES AND INEFFECTIVE ASSISTANCE OF COUNSEL

¶ 11 In *McFadden*, the court of appeals concluded that counsel did not provide ineffective assistance when he failed to advise a defendant of the risk of deportation prior to his guilty plea. 884 P.2d at 1305. McFad-

den was a Canadian citizen who pleaded guilty as part of a bargain to reduce his charge of forcible sexual abuse. *Id.* at 1304. Prior to sentencing, he moved to withdraw his guilty plea after learning that his conviction could trigger his deportation. *Id.* The trial court denied the motion, and on appeal the court of appeals agreed, stating that the possibility of deportation was merely a collateral consequence unrelated to the sentence imposed and the failure of counsel to advise Mr. McFadden of the possibility of deportation did not deprive him of effective assistance of counsel. *Id.* at 1304–05.

### A. Deportation Is Merely a Collateral Consequence of the Criminal Process

¶ 12 Because there was then no controlling law relating to collateral consequences in this jurisdiction, the court of appeals relied on case law from other jurisdictions to reach its decision. *McFadden,* 884 P.2d at 1305. The court referenced twelve federal courts that all concluded that "counsel's failure to warn of possible deportation ... is a collateral consequence of the criminal process and hence the failure to advise does not amount to ineffective assistance of counsel." *Id.* The decisions of these courts were unified in their reliance on a common traditional definition of collateral, namely, that

> [a] consequence is collateral if an agent independent of the court—either the defendant or another governmental entity— must act to cause that consequence. Courts view deportation as a collateral consequence of conviction. They deem potential deportation of an alien defendant a collateral consequence of his guilty plea because an agency which operates beyond the direct authority of the trial judge controls that sanction.

Ethan Venner Torrey, *The Dignity of Crimes: Judicial Removal of Aliens and the Civil–Criminal Distinction,* 32 Colum. J.L. & Soc. Probs. 187, 197 (1999).

The Court of Appeals for the Second Circuit added

> [t]he district judge, in our view, has the obligation to ascertain that the consequences of the sentence he imposes are understood. Deportation here, as before, was not the sentence of the court which accepted the plea but of another agency over which the trial judge has no control and for which he has no responsibility.... He must assure himself only that the punishment that he is meting out is understood.

*Id.*

¶ 13 This appears to be true even when state law conflicts with federal law. As the Seventh Circuit stated in *United States v. Ray,* 828 F.2d 399, 418 (7th Cir.1987), "[w]hether [a] federal sentence runs consecutively or concurrently to [a] state sentence is not a direct consequence of a guilty plea and therefore need not be explained to defendant in order for [a] guilty plea to be constitutionally valid." Furthermore,

> [a]dministrative separation of the criminal prosecution from the deportation proceeding renders deportation a collateral consequence of the plea. Deportation under the I.N.A. is neither automatic, nor vested with the courts. It is vested with the Attorney General, who must institute a separate proceeding if she decides, in her discretion, to deport the alien. A guilty plea entered, therefore, without knowledge of the collateral consequence of deportation, is knowing and voluntary as a matter of law. If deportation decisions are embodied in plea agreements, however, as permitted by section 1228(c), then deportation would become part of "the sentence of the court which accepted the plea," and would emphatically not be the decision of "another agency over which the trial judge has no control and for which he has no responsibility."

Torrey, *supra* at 199–200.

¶ 14 In *McFadden,* the court of appeals also noted that it had discovered eleven *state* jurisdictions that also followed the federal rule that counsel is not required "to inform an accused of possible deportation consequences of a guilty plea." 884 P.2d at 1305.

### B. The Court of Appeals Recognizes an Exception to the Collateral Rule if Counsel Affirmatively Misrepresents Deportation Consequences

¶ 15 The court of appeals was careful to note an exception to the collateral conse-

quences rule "when counsel affirmatively, but erroneously, represents that the accused will not be subject to deportation." *McFadden,* 884 P.2d at 1305 n. 3. As a foundation for the affirmative misrepresentation exception, the *McFadden* court looked to *Downs–Morgan v. United States,* 765 F.2d 1534, 1540–41 (11th Cir.1985). Mr. Downs–Morgan was a resident of Nicaragua who pleaded guilty to one count of conspiracy to import marijuana in exchange for the dismissal of the charge of possession with intent to distribute. *Id.* at 1536. His attorney incorrectly advised him that the conviction would not subject him to deportation. *Id.* Mr. Downs–Morgan argued that his guilty plea was based on this erroneous advice. *Id.* The court also accepted evidence that Mr. Downs–Morgan would be persecuted if returned to Nicaragua, face imprisonment for many years, and possibly lose his life for his participation in anti-communist activities. *Id.* at 1538. Mr. Downs–Morgan argued that ineffective assistance of counsel rendered his plea invalid since he could not reasonably have made an intelligent and voluntary decision to face the fate that lay in store for him in Nicaragua. *Id.*

¶ 16 In a footnote, the *Downs–Morgan* court distinguished between a guilty plea based on "patently erroneous" advice and cases where the plea was "based on competent, good faith advice which later turn[ed] out to be incorrect." *Id.* at 1539 n. 11. In another footnote, *Downs–Morgan* cited *State v. Malik,* 37 Wash.App. 414, 680 P.2d 770 (1984), where "the court found no ineffective assistance of counsel because the evidence showed that the defense attorney had informed the defendant that it was 'possible' that he would be deported." *Id.* at 1540 n. 13.

¶ 17 The *Downs–Morgan* court also relied on *People v. Correa,* 124 Ill.App.3d 668, 80 Ill.Dec. 395, 465 N.E.2d 507 (1984), which held that "[w]here defense counsel has unequivocally represented to his client that [a guilty] plea will not result in his deportation and the defendant has relied upon this patently erroneous advice in deciding to plead guilty, post-conviction relief is appropriate...." *Id.* at 1540. In the end, the *Downs–Morgan* court refused to hold that

"an affirmative misrepresentation by an attorney in response to a specific inquiry by the accused which results in a plea of guilty necessarily constitutes ineffective assistance of counsel." *Id.* "[T]he performance inquiry must be whether counsel's assistance was reasonable considering the circumstances." *Id.* at 1541 (internal quotation marks omitted).

¶ 18 In the present case, the court of appeals found that counsel's statements to Mr. Rojas–Martinez that he "might or might not be deported" was an affirmative misrepresentation and was therefore subject to the exception to the collateral rule. *See State v. Rojas–Martinez,* 2003 UT App 203, ¶ 10, 73 P.3d 967. This determination had the practical effect of merging within it the analysis of the first *Strickland* prong, whether the attorney's performance fell below an "objective standard of reasonable professional judgment," and the court of appeals inevitably found that it did. *Id.*

## II. WE ADOPT THE COLLATERAL CONSEQUENCE RULE AND THE AFFIRMATIVE MISREPRESENTATION EXCEPTION TO IT

¶ 19 We take seriously the gravity of the consequences of deportation, a sanction that can be the "equivalent of banishment or exile." *Fong Haw Tan v. Phelan,* 333 U.S. 6, 10, 68 S.Ct. 374, 92 L.Ed. 433 (1948) (citing *Delgadillo v. Carmichael,* 332 U.S. 388, 68 S.Ct. 10, 92 L.Ed. 17 (1947)). Additionally, even "[t]hough deportation is not technically a criminal proceeding, it visits a great hardship on the individual and deprives him of the right to stay and live and work in this great land of freedom." *Reno v. Am. Arab Anti–Discrimination Comm.,* 525 U.S. 471, 497–98, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999) (referring to *Bridges v. Wixon,* 326 U.S. 135, 154, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945)). Deportation is especially harsh when it interferes with familial relationships. *Santosky v. Kramer,* 455 U.S. 745, 787, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) ("Few consequences of judicial action are so grave as the severance of natural family ties."). Mr. Rojas–Martinez has three children who are citizens of the United States, and his wife has applied

for lawful permanent alien status. We are not insensitive to the reality that Mr. Rojas–Martinez's deportation will work a hardship on his family.

¶ 20 Our recognition of the harsh realities of deportation does not, however, persuade us that counsel representing a defendant facing potential deportation owes her client the duty to affirmatively and correctly advise the client of the implications of a guilty plea on the right of the defendant to continue to reside in the United States. We therefore adopt the rule outlined in *McFadden* that deportation is a collateral consequence of the criminal process and that defense counsel's failure to advise a defendant about all possible deportation consequences does not amount to ineffective assistance of counsel. 884 P.2d at 1304–05. We also embrace the exception to the collateral consequence rule when attorneys affirmatively misrepresent the deportation consequences of a guilty plea.

### III. THE EXCEPTION TO THE COLLATERAL CONSEQUENCE RULE DOES NOT APPLY TO THE STATEMENTS COUNSEL MADE TO MR. ROJAS–MARTINEZ

¶ 21 Mr. Rojas–Martinez was "informed ... that [a] guilty plea and conviction could lead to deportation, but it might or might not." Unmistakable themes of this statement are uncertainty and equivocation. In our view, however, the uncertainty expressed in counsel's statement should not overshadow its central topic: that the entry of a guilty plea carried the risk of deportation. Focusing on the equivocal nature of counsel's statement, the court of appeals concluded that anything less than an accurate communication of the virtual inevitability of Mr. Rojas–Martinez's deportation under the provision of the 1996 amendments to the Immigration and Naturalization Act would amount to an affirmative misrepresentation and therefore fall within the exception to the collateral consequence rule. We disagree.

#### A. *Mr. Rojas–Martinez's Counsel Made No Affirmative Misrepresentations*

¶ 22 Our reasons for departing from the court of appeals's conclusion that the advice given by Mr. Rojas–Martinez's counsel satisfied the exception of the collateral rule can be largely explained by the differing lessons we draw from cases from other jurisdictions that take up the collateral consequence question. Of these cases, we will confine our discussion to *Roberti v. State,* 782 So.2d 919, 920 (Fla.Dist.Ct.App.2001); *People v. Soriano,* 194 Cal.App.3d 1470, 240 Cal.Rptr. 328, 336 (1987); and *United States v. Couto,* 311 F.3d 179, 188 (2d Cir.2002), as they seem most directly applicable to the present circumstance.

¶ 23 First, *Roberti* was used by the court of appeals to support the conclusion that ineffective assistance of counsel may exist even if incorrect advice is offered regarding a collateral matter. *See Rojas–Martinez,* 2003 UT App 203, ¶ 8, 73 P.3d 967. The defendant in *Roberti* did not allege that his counsel failed to state that his plea could subject him to the act, but that counsel affirmatively misadvised him that it would not. *Roberti,* 782 So.2d at 920. Mr. Roberti's counsel affirmatively advised him that he was free of deportation risk. Mr. Rojas–Martinez was, by contrast, advised that he faced the risk of deportation.

¶ 24 Next, the court of appeals relied on *Soriano,* a case that does feature an equivocal expression of risk. The court of appeals characterized *Soriano* as an example of "finding counsel ineffective where counsel merely warned defendant there *'might be immigration consequences to his guilty plea.'" Rojas–Martinez,* 2003 UT App 203, ¶ 8, 73 P.3d 967 (emphasis added) (quoting *Soriano,* 240 Cal.Rptr. at 336). Mr. Soriano pleaded guilty in exchange for the judge's recommendation of probation and reduced jail time. The trial court informed him that "his guilty plea could have immigration consequences." *Soriano,* 240 Cal.Rptr. at 330. Mr. Soriano claimed that his counsel told him on two separate occasions that he would not be deported. *Id.* at 334. However, defense counsel stated that her statements to Mr. Soriano were identical to those made by the court: that there could be immigration consequences to Mr. Soriano's guilty plea, as outlined in section 1016.5 of the California

Penal Code. *Id.* at 336. The California Court of Appeals ruled that Mr. Soriano had received what amounted to a pro forma caution about the immigration sanctions that might attend his guilty plea, thus depriving him of effective assistance of counsel. *Id.*

¶ 25 At the outset, we take note of our reluctance to concede that the *Soriano* court correctly concluded that counsel's accurate, but incomplete, description of the potential immigration penalties that awaited Mr. Soriano upon the entry of his guilty plea constituted an affirmative misrepresentation within the contemplation of the exception to the collateral consequence rule. That said, while the statements made to Mr. Soriano could fairly be interpreted to have alerted him to risk, it was an unspecified risk of "immigration consequences." *Id. Soriano* is distinguishable from the present case, as the advice given in *Soriano* left the defendant to guess what the legal consequences of a guilty plea might be. Mr. Rojas–Martinez, however, was clearly informed about what was at stake. His guilty plea "could lead to deportation." *Rojas–Martinez*, 2003 UT App 203, ¶ 2, 73 P.3d 967. The information about the nature of the risk given to Mr. Rojas–Martinez was materially different from that given to Mr. Soriano.

¶ 26 Finally, the court of appeals turned to *Couto* to shore up its conclusion that "an affirmative misrepresentation by counsel as to the deportation consequences of a guilty plea is ... objectively unreasonable." *Rojas–Martinez*, 2003 UT App 203, ¶ 8, 73 P.3d 967. However, the court of appeals acknowledges that the *Couto* court also held that "an attorney's failure to inform a client of the deportation consequences of a guilty plea, without more, does not fall below an objective standard of reasonableness." *Id.* ¶ 7. The defendant in *Couto* contended that her attorney advised her to plead guilty to an accusation of bribing an immigration officer to avoid jail time. He further advised her that they could deal with her immigration problem after the plea was entered. *Couto,* 311 F.3d at 183. Counsel also told Ms. Couto that there were many things she could do to avoid being deported and, at the hearing, no mention was made of possible deportation consequences. *Id.* At no time was Ms. Couto informed that the amendments to federal law rendered her automatically deportable after pleading guilty to the offense. *Id.* at 183–84. The *Couto* court analyzed whether the defendant's plea was knowing and voluntary, and found it was not, due to ineffective assistance of counsel. *Id.* at 187.

¶ 27 Like *Roberti, Couto* can be distinguished from Mr. Rojas–Martinez's circumstances by the reasons that the attorney in *Couto* not only failed to inform the client of the deportation consequences of a guilty plea, but affirmatively told her that she could make herself non-deportable. Mr. Rojas–Martinez received no such misleading advice.

¶ 28 These cases reinforce our view that the inquiry into whether a defendant should be eligible for relief under the affirmative misrepresentation exception to the collateral consequence rule properly centers on whether a communication made by counsel misrepresented the sanction to which the client was exposed and whether the statement identified the existence and degree of risk that the guilty plea will cause the sanction to be visited on the client. Mr. Rojas–Martinez was specifically advised that what was at stake was deportation. The question that we answer is whether Mr. Rojas–Martinez's counsel's characterization of the risk of deportation fell below an objective standard of reasonable professional judgment.

¶ 29 We do not believe that any erroneous statement of deportation risk would inevitably amount to an affirmative misrepresentation. In this respect, we depart from the view of the court of appeals, which makes anything short of an unequivocal expression of the certainty of deportation eligible for treatment under the exception to the collateral consequence rule. Our assessment of whether counsel's description of deportation risk amounted to an affirmative misrepresentation is a practical one, but one which unavoidably strays into the realm of part two of the *Strickland* test because it measures the statement's qualifications as an affirmative misrepresentation against the reasonable effect the characterization of risk would have had on Mr. Rojas–Martinez. Our test thus impliedly weighs the prejudice, if any, that

was likely caused by understating Mr. Rojas–Martinez's risk of deportation. We do not apologize for collapsing the *Strickland* tests in this setting. It is necessary to coherently evaluate whether an understatement of the risk of deportation was substantial enough to be an affirmative misrepresentation.

¶ 30 We are mindful that Mr. Rojas–Martinez submitted an affidavit in which he stated that he "would not have pleaded guilty" and "would have gone to trial [to] prove [his] innocence" had he known that he would be automatically deported. *Rojas–Martinez,* 2003 UT App 203, ¶ 11, 73 P.3d 967. His assertions are not, however, dispositive in the context of the objective standard to be applied to counsel's performance under the first *Strickland* test. Put another way, counsel's statement of Mr. Rojas–Martinez's risk of deportation should be evaluated by asking whether, viewed objectively, the statement departed so far from the correct statement of risk that it would cause the reasonable client to choose a course of action other than that which he would have chosen had he been given an accurate account of the risk. Assessed in this way, the statement of risk made by Mr. Rojas–Martinez's counsel is not an affirmative misrepresentation. Even were we to assume that counsel understated Mr. Rojas–Martinez's risk of deportation by half, reducing it from a certainty to a 50–50 proposition, we believe that the possibility that a defendant's ability to reside in the United States turned on the toss of a coin imparts more than enough gravity to the risk of deportation. So a guilty plea entered based on a 50–50 proposition would not differ in its calculation of the importance of deportation consequences than would a plea based on a precise statement of deportation risk.

### C. Reliance on I.N.S. v. St. Cyr is Misplaced

¶ 31 Mr. Rojas–Martinez relies on the Supreme Court decision in *I.N.S. v. St. Cyr,* 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001), to advance claims that deportation is no longer a collateral consequence of a guilty plea and that there now exists a constitutionally mandated requirement to provide a defendant accurate information regarding the immigration consequences of his plea. *St. Cyr* stands for neither proposition.

¶ 32 *St. Cyr* involved the deportation of a Haitian citizen who pleaded guilty, pursuant to a plea agreement, to selling a controlled substance. 533 U.S. at 293, 320, 321–22, 121 S.Ct. 2271. At the time of his plea, immigration law made Mr. St. Cyr eligible for a waiver of deportation at the discretion of the Attorney General. *Id.* However, actual removal proceedings were not commenced until after a change in the law became effective that removed the Attorney General's discretion to grant waivers to individuals in the defendant's situation. *Id.* The Supreme Court was faced with the question of whether the waiver prohibition could be retroactively applied to deny Mr. St. Cyr a waiver. The Supreme Court held that it could not.

¶ 33 The Supreme Court noted that prior to the enactment of the new law, waivers were frequently granted, and would have been "one of the principal benefits sought by defendants deciding whether to accept a plea offer or instead proceed to trial." *Id.* at 323, 121 S.Ct. 2271. In a footnote, the Court added that even if the defendant was not initially aware of the provision allowing for a waiver, "competent defense counsel, *following the advice of numerous practice guides,* would have advised the client of the provision's importance," as waivers were frequently granted. *Id.* at 323 n. 50, 121 S.Ct. 2271 (emphasis added).

¶ 34 Mr. Rojas–Martinez seizes on this aspirational language and attempts to recast it as creating a constitutional standard of care applicable to attorneys who counsel alien criminal defendants. We disagree. The practice admonitions offered by the Supreme Court, which we fully endorse, were invoked to underscore the injustice that would result if Mr. St. Cyr were denied access to a waiver of deportation because of the retroactive application of the amended statute after having not been informed of the yet-to-be-enacted waiver prohibition by his counsel before he entered his guilty plea. The practice standards referenced by the Supreme Court were not accompanied by any language that would suggest that it was the Court's intention to

cloak these practice guidelines in constitutional garb.

¶ 35 Because we have held that Mr. Rojas–Martinez's counsel's statements concerning the deportation risk of Mr. Rojas–Martinez's guilty plea was a collateral consequence not eligible for consideration under the affirmative misrepresentation exception, they fall short of satisfying the first prong of the *Strickland* test. Therefore, we need not take up the State's challenge to the court of appeals's determination that Mr. Rojas–Martinez satisfied the prejudice requirement of *Strickland.*

## CONCLUSION

¶ 36 We hold that Mr. Rojas–Martinez's counsel did not provide ineffective assistance of counsel when he stated that Mr. Rojas–Martinez was at risk of deportation if he entered a guilty plea. We therefore reverse the decision of the court of appeals and reaffirm the decision of the trial court.

¶ 37 Associate Chief Justice WILKINS, Justice DURRANT, and Justice PARRISH concur in Justice NEHRING's opinion.

DURHAM, Chief Justice, dissenting:

¶ 38 Although I concede this to be a close call, I respectfully dissent. I disagree that Mr. Rojas–Martinez was properly informed about what the legal consequences of a guilty plea were. The language "could lead to deportation" does not communicate the fact that the plea automatically resulted in deportation status as a matter of law. It creates the impression that deportation is only possible, not legally mandated. For that reason, I agree with the court of appeals that this case more closely resembles *United States v. Couto,* 311 F.3d 179 (2d Cir.2002), where the defendant was not informed that her plea rendered her automatically deportable. This defendant likewise became automatically deportable as a result of his plea, and the suggestion that the plea "could lead to deportation" was therefore inaccurate.